## ED MATTHEWS v. THE STATE.

### No. 1927. Decided May 16, 1900.

**1. Reassembling Grand Jury—Practice.**

Where a grand jury after having been discharged is reassembled as provided in article 411, Code of Criminal Procedure, and one of the members of said original grand jury who appears and is in attendance is disqualified, it is the proper practice to excuse him and impanel another qualified grand juror in his stead. The impanelment of such new grand juror does not create a grand jury of thirteen men nor upon that ground invalidate an indictment found by them. Following Trevinio v. State, 27 Texas Criminal Appeals, 372. Henderson, Judge, dissenting.

**2. Murder—Self-Defense—"Serious Bodily Harm"—Charge.**

On a trial for murder, where the evidence showed that deceased made an assault upon defendant with a pistol, and the court charged upon the right of defense upon appearance of danger, the mere absence of a statement in the charge that defendant had the right to defend against "danger of serious bodily harm" was harmless error, unless there was some evidence that the assault was one intended to inflict serious bodily harm and not death.

**3. Same—Provoking Difficulty—Charge.**

It is not necessary for the court in charging upon provoking the difficulty to tell the jury the facts upon which they can find that defendant has provoked the difficulty. The proper practice is to tell the jury that if defendant provoked the difficulty with the intention to kill he would be guilty of either murder in the first or second degree as the case may be upon the facts; or if defendant provoked

the difficulty without such apparent intention, he would be guilty of manslaughter. A contrary holding in Mozee v. State, 51 Southwestern Reporter, 250, is dicta.

**4. Same—Provoking Difficulty.**

The whole matter of provoking a difficulty depends upon the intent of defendant. If defendant intends to provoke the difficulty and uses such means as he thinks will and does provoke it, it is immaterial whether the provoking means used by him were reasonably calculated to provoke the difficulty or not.

APPEAL from the District Court of Cherokee, on a change of venue from Anderson. Tried below before Hon. J. G. Russell, Judge of the Seventh Judicial District, on exchange with Hon. Tom C. Davis, Judge of the Second Judicial District.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of Jim Stafford in Anderson County on the 15th day of June, 1899, by shooting him with a pistol.

The matter pertaining to the reassembling of and impanelment of the grand jury that presented the indictment are sufficiently stated in the opinion.

At the time of the killing Jim Stafford was deputy sheriff of Anderson County and appellant Ed Matthews was city marshal of the city of Palestine. The following testimony will sufficiently illustrate the facts attendant upon the killing as proved by the State: Saddler, the State's principal witness, testified that he and deceased were sitting in the sheriff's office in the jail, engaged in the discussion of official business; that he heard a vehicle moving, and, looking out of the window, saw appellant passing in front of and near same in a buggy; that in an instant appellant had passed the window and out of his sight, and then continuing his testimony, he said: "Immediately afterwards I recognized his voice call out, 'Jim Stafford, come out here; I want to see you.' Stafford got up from his seat and went out of the jail, and I followed him. As Stafford reached the edge of the street and just as I got to the jail door, defendant got out of his buggy, turned his back west in the direction his horse's head was turned, stood by his horse about half way between its head and the front wheels of his buggy, placed his left hand either on the shaft or harness, straightened himself up perfectly straight and dropped his right hand down near his right hip. By this time I was going down the steps of the jail door and deceased had taken three or four steps into the street towards the defendant, when he, Matthews, said: 'By God, I want to know what you all were doing over there last night meddling with my business.' Deceased replied: 'I was not meddling with your business. I was only discharging my duty with Mr. Cook,' or 'under Mr. Cook,' I don't know which. Defendant replied: 'God damn you, I want you to understand, by God, I am running or attending to that town, and by God I want you all to stop meddling with my business,' or 'affairs.' I think he said 'affairs.' Deceased replied: 'Ed, I have not meddled with your

business. I have only been trying to discharge my duty, which expect to do so long as I hold my place.' Defendant replied: 'God damn your souls, I not only want you to quit meddling with my business, but to stay away from over there.' Deceased then said: 'Ed, I don't want any trouble, but, by God, I will discharge my duty.' Defendant replied: 'God damn you, get out from here,' pulled his pistol and fired at deceased. When the shot fired, deceased staggered backwards a short step and then at once stepped forward, and as he took the first step forward, pulled his pistol," etc.

Taylor testified: "Deceased was standing near the hind wheel of defendant's buggy with his body inclined against or leaning upon the hind wheel of the buggy, and I think, with his elbow resting on or against the buggy wheel. He had both hands in front of him and was making gestures with them as if trying to explain something. I could not see his hands. I heard defendant say: 'God damn you, you all treat me like a damn hyena,' and the deceased replied: 'Ed,' or 'Now Ed,' and say something else which I did not catch, but which sounded like it was in an argumentative way. Defendant then said: 'God damn you, get out from here,' or 'get away from here,' and at the same time drew his pistol and fired, very quick," etc.

Defendant, as a witness in his own behalf, testified: "* * * As I passed the jail I saw through the window what I took to be a man's hat, and supposing it to be the jailer John Brown, I called: 'Johnnie Brown,' as I checked up my horse. The horse was a little unmanageable in driving, and went a little distance after I commenced to check him. When he stopped and when I was sitting in my buggy, on looking towards the jail I saw deceased coming towards me, and remarked to him: 'Hello, Jim, I thought you were Johnnie Brown. But you will do as well. Has Glenn Wright been over here?' He replied 'No.' I remarked, 'Well, that's all,' and slackened the reins of my horse, starting to go on. Just as I did so, I noticed that one of the reins had got under the left shaft and that a knot on the line had slipped through a ring on the harness and could not be pulled back, and I at once jumped over the front wheel of my buggy and went to near my horse's head, adjusted the rein, and was engaged in pulling a knot in the line through a ring in the harness, when deceased, who I supposed had gone back to the jail, said: 'That wasn't what you wanted.' I then turned my face towards him and asked: 'What was it I wanted, Jim?' He replied: 'You wanted to renew that last night's business.' I replied, 'What about last night's business?' He replied, 'Well, that's all right. We had you coppered.' I then asked: 'What do you mean by having me coppered?' He replied, 'We had you coppered.' I remarked: 'Do you mean when Cook and those parties had me shadowed around by the bank building watching or treating me like I was a damned hyena? You people attend to your business and I will attend to mine,' and I added: 'You go away from me. I never called you out here in the first place, furthermore I didn't come here for any trouble. Go

away from me.' As I made the remark, 'Go away from me,' I waved my right hand at deceased, and moved my body forward, intending to get in my buggy. Deceased said: 'God —,' added something else I did not hear, and reached for his pistol. I at once reached for mine, and as soon as I could, pulled it and fired. I think the first shot I fired was as I pulled my pistol and that the charge went in the ground near me. The deceased then had his pistol out and advanced on me with it in both hands. I held on to my horse and moved backwards with him as he moved. When I fired the last shot I had got on the sidewalk and deceased had got near the edge of the sidewalk. My horse broke loose from me just before I fired the last shot. I did not think until the deceased fell when I fired the last shot that I had hit him, and the thought flashed through my mind at the time that my pistol had been tampered with." Appellant's testimony was corroborated in material particulars by the testimony of the witness Bill Yeager, the witness S. A. Taylor, and by the testimony of other witnesses.

*Gregg & Brooks, Dashiel & Dashiel, C. M. Kay, Perkins & Gibson,* and *Wilson & Watkins,* for appellant.—As to the reassembling of the grand jury, the setting aside of the grand juror Tucker, and the substitution in his place and stead of the new grand juror, Gossett. No person shall be held to answer for a criminal offense unless on indictment of a grand jury, etc. Bill of Rights, sec. 10.

Grand juries in the district court shall be composed of twelve men. Const., art. 4, sec. 13; Lott v. State, 18 Texas Crim. App., 629.

An attempt by the court to discharge a member of the grand jury is a nullity, and the person so attempted to be discharged is still a member of the grand jury. Smith v. State, 19 Texas Crim. App., 108; Trevinio v. State, 27 Texas Crim. App., 377.

If the attempt by the court to discharge Tucker was a nullity, and he was still a member of the grand jury, Gossett's presence when the grand jury were deliberating upon the accusation against appellant, and while they were voting upon the same, was not authorized by law. Code Crim. Proc., art. 559.

So the merit of appellant's objection depends upon the answer which should be given to this question: Was the act of the court in discharging Tucker a nullity? If the court had discharged Tucker before the grand jury had been discharged for the term, clearly his act would have been a nullity. Smith v. State, 19 Texas Crim. App., 108; Trevinio v. State, 27 Texas Crim. App., 377. And Tucker remaining a member of the grand jury, the impaneling of Gossett as a member increased the grand jury to thirteen men. Did the fact that the grand jury had been discharged for the term and had been reassembled confer upon the court the authority it did not before have to discharge a member of the grand jury? If it did, such authority must have been conferred by article 411 of the Code of Criminal Procedure, which declares that "when a grand jury has been discharged by the court for the term, it may be reassembled by the court

at any time during the term, and in case of failure of one or more members to reassemble, the court may complete the panel by impaneling other qualified persons in their stead, in accordance with the rules prescribed in this chapter for completing the grand jury in the first instance. We are aware that the Court of Appeals construing this statute in Trevinio v. State, 27 Texas Criminal Appeals, 376, has held: (1) That when a grand jury has completed its labors and as a body has been discharged for the term, "as a body it ceases to exist and its autonomy and personnel are in a measure, if not completely, changed and destroyed when it is sought to reassemble them." (2) That "when the jury are reassembled after having once been discharged, they must be again impaneled—that is, tested as to qualification and sworn again;" and, as logically following, (3) that the court on the reassembling of the twelve can excuse one of the number and take in his place one of the sixteen drawn by the jury commissioners. With the utmost respect for the court rendering the opinion in that case, we submit it is wrong. The reasoning in the case is:

If the Legislature had intended the original personnel to control, it would have provided that any nine of the original body might transact the business for which the grand jury was reassembled. To this it may be answered: (1) If the Legislature did not intend that the original personnel should control, the direction would have been to reassemble the sixteen men drawn for jury service, instead of the grand jury. (2) It would not have left unprovided for a case where nine of the grand jury did not appear. (3) Some direction would have been given about impaneling the new grand jury to be organized, instead of the direction being confined to the completion of the panel—by the word "panel" is meant the whole body of the grand jurors (Code of Criminal Procedure, article 399)—by impaneling "other qualified persons" in the stead of those who did not appear.

The truth is, the correctness of the decision in the Trevinio case and of the reasoning on which it is based, turns on the correctness of the conclusion therein reached that the reassembled body is not a grand jury already tested as to their qualifications, impaneled and sworn, but a body of men to be tested as to their qualifications, and if found qualified, to be impaneled and sworn as a grand jury. This conclusion, we earnestly insist, is wrong, that it is not only without any support in the statute, but is directly opposed to its obvious meaning. The intent of the statute to preserve unchanged the personnel of the grand jury discharged and the grand jury reassembled when all its members appear, seems to be as certain as language can state. It will be noted that the authority conferred upon the court when a grand jury has been discharged for the term, is not to reassemble the sixteen men drawn for service as grand jurymen, but it is to reassemble the grand jury discharged. If that grand jury reassembles, no authority over its personnel is conferred upon the court. It is the grand jury as truly and as completely as it was before it was discharged. The authority of the court to change its personnel is conferred upon one contingency alone:

the failure of one or more of its members to reassemble. In that case, and in no other case, the court is authorized to complete the "panel" by impaneling other qualified persons in their stead, in accordance with the rules prescribed for completing the grand jury in the first instance. Code Crim. Proc., art. 411. That we are right in this contention seems to have been quite recently determined by the Court of Criminal Appeals in Gay v. State, 40 Texas Criminal Reports, 242, where the appellant moved to quash the indictment "on the ground that the grand jury which found the bill had previously been adjourned for the term, and that when it was reassembled it was not then impaneled and sworn according to law." The court, by HENDERSON, Judge, disposing of the question, say: "It was not necessary" when the grand jury was reassembled "to reimpanel them; that is, it was not necessary to go through the formality of testing them as to their qualifications and reswear the members of said grand jury," and the court adds that article 411 of the Code of Criminal Procedure controls the matter, and does not contemplate, when "the constituents of a grand jury reassembled are the same, that the court shall do more than set aside the order discharging the grand jury, and then order their reassembling."

It should be borne in mind that the right to challenge the array of jurors or any person presented as a juror must be exercised before the grand jury is impaneled (Code Criminal Procedure, article 397), and that, therefore, appellant had no right under the law to make a challenge. Any other rule might result in a change in the personnel of a grand jury every day during its term of service. It could not have been contemplated that every person accused of the commission of an offense after the grand jury is impaneled, should have a right to challenge either the array or a member of the body. After a grand jury is impanel there is no "array" to challenge. Code. Crim. Proc., art 398. And it should also be borne in mind that appellant, if he had the right to challenge the grand juror Tucker, not only did not exercise it, but expressly refused to challenge him. Raines v. State, 19 Texas Crim. App., 480; Ex Parte Reynolds, 35 Texas Crim. Rep., 438; Wells v. State, 21 Texas Crim. App., 596.

The principal objections to the charge of the court on self-defense are:

(1) It limits the right of the jury to acquit appellant on the ground of self-defense to belief on his part that his life was in danger, produced by hostile acts on the part of deceased. The testimony of appellant was that deceased said "God," added something he did not hear, and immediately reached for his pistol. Now, if the jury believed from the evidence that appellant's belief that his life was in danger arose not alone from deceased's acts, but from his words coupled with his acts, they were not authorized by the charge to find he acted in self-defense. The statute by its express language authorized appellant to kill if it reasonably appeared to him by the acts, or by words coupled with the acts of deceased, that it was his purpose and intent to kill appellant or inflict upon him some serious bodily injury. Penal Code, art. 675, subdiv. 1, and art. 679. The word heard and the words not

heard, referred to above, in connection with the other language used by deceased just preceding them, may in the minds of the jury have reasonably impressed appellant that deceased's act in reaching for his pistol indicated an intention on deceased part to kill appellant or inflict upon him some serious bodily injury, and the jury may not have believed that the act alone, considered without reference to the words preceding and accompanying it, was reasonably sufficient to produce in appellant's mind a belief that he was at the time in danger of death or serious bodily injury.

(2)   It limits appellant's right to act to belief at the time that his life was in danger. The language of the charge, applying the principles of law to the case before the jury, is: "Therefore, if you believe from the evidence that the defendant at the time of the homicide believed that his life was in danger, such fear being produced by hostile acts on the part of deceased," etc. If appellant believed he was in danger of serious bodily injury, his right to self-defense would have been as perfect as it would have been had he believed his life was in danger, and the court in applying the charge to his case should have so instructed the jury. Fuller v. State, 30 Texas Crim. App., 565.

The court erred in that portion of the charge which related to appellant's provoking the difficulty.

(1)   That it is not every wrongful act which brings about the necessity of taking life to preserve his own, that will deprive the slayer of his right of self-defense.

(2)   That it is not the law without qualification that he who brings on an affray in which he intends to wreak his malice can not avail himself of the shield of self-defense.

(3)   That it is not the law without qualification that one who provokes a contest or produces the occasion to kill another or do him some serious bodily harm, with intent to do so, is guilty of murder, although he may have done the act of killing suddenly, without deliberation, to save his own life.

(4)   That it is not the law without qualification that a defendant who by his own wrongful act brings about the necessity of killing the deceased, intentionally and with a view thereto, or provokes a difficulty with the intention of killing deceased, intentionally and with a view thereto, is guilty of murder.

(5)   That it is not the law without qualification that if the defendant provoked the difficulty resulting in deceased's death, or by his own wrongful act produced the necessity for killing deceased, but with no intention to kill him or inflict upon him serious bodily harm, he would be deprived of his right of self-defense and be guilty of manslaughter, if he suddenly, and under the influence of sudden passion arising from an adequate cause, shot and killed deceased.

(6)   That as a part of the law on the issue of provoking a difficulty the court should have charged the jury, and did not: (1) As to the kind and character of wrongful acts on the part of defendant which

would deprive him of his right of self-defense; (2) as to the effect on defendant's right of self-defense where the provocation, if any, of deceased, reasonably should not have arisen from defendant's acts, if any; and (3) should have indicated from the evidence what act or acts of defendant would have been sufficient to provoke a difficulty and deprive him of his right of self-defense, and should have defined the effect and bearing of such act or acts of defendant upon the case, instead of leaving it to the jury to speculate and conjecture as to the nature and quality of such act or acts, and the extent of its or their limitation and abridgement of defendant's right of self-defense.

By the charge complained of the jury are told that appellant would be deprived of his right of self-defense: (1) If by his own wrongful act he brought about the necessity of killing deceased to save his own life. (2) If he brought on an affray in which he intended to wreak his malice, though his own life was imperiled in such affray. (3) If he provoked the contest or produced the occasion with the intention of killing deceased, or of doing him some serious bodily harm, although he may have killed to save his own life.

And in the application of those general principles to appellant's case the jury were instructed: (1) If they believed appellant by his own wrongful act brought about the necessity of killing deceased, intentionally and with a view thereto, or, (2) if appellant provoked the difficulty with the intention of taking the lilfe of deceased, intentionally and with a view thereto, the homicide would be murder, even though he may have done the act of killing suddenly and to save his own life.

Now, we submit, to deprive appellant of his perfect right of self-defense, he must at the time have: (1) Done an act, or spoken words reasonably calculated under the circumstances to bring on the difficulty. Cartwright v. State, 14 Texas Crim. App., 502; Carter v. State, 37 Texas Crim. Rep., 407. (2) Done the act or spoken the words with the intent and purpose thereby to bring on the difficulty. Winters v. State, 37 Texas Crim. Rep., 586. (3) The act done, or words spoken, must have been such as he had no right to do or speak. Shannon v. State, 35 Texas Crim. Rep., 2; Ball v. State, 29 Texas Crim. App., 107; Milrainy v. State, 33 Texas Crim. Rep., 591. (4) The act done or words spoken must have provoked the difficulty. The absence of either of these elements would leave his perfect right of self-defense unimpaired. If they all concur, he would be deprived of his perfect right of self-defense, and would have an imperfect right, or none at all, dependent upon whether he provoked the difficulty with the intent and purpose to kill or do serious bodily injury, or with some other intent and purpose not felonious.

The specific objections we urge to the charge are: (1) It ignores the requirement that the act done, or words spoken, must have been reasonably calculated under the circumstances to bring on the difficulty. In Cartwright's case, 14 Texas Criminal Appeals, 498, the court say: "What character of wrong acts must product the necessity

to take life? ˙Suppose the wrong acts were not calculated to produce
the necessity, but did have this effect? Again, suppose the wrong acts
were not intended to 'produce the necessity' by the wrong-doer? Would
the party guilty of the 'wrong acts' be guilty of culpable homicide, who
to save his own life, takes the life of another under the supposed case?"
Later on in the same opinion the court answers the question: "It
would follow, therefore, that the conduct of the party must show that
he knowingly and willingly used language or did acts which might
reasonably lead to an affray or a deadly conflict." (2) It did not de-
fine and indicate from the evidence the act or acts of provocation by
appellant which would deprive him of his right of self-defense, or
limit his right, but left it to the jury to speculate and conjecture as
to the nature and quality of the act of provocation which would com-
promit his right of self-defense.

The court left it to the jury, without any instruction to guide them,
to determine whether the defendant did or not provoke the difficulty
by a "wrongful act." The answer to the question, "What is a 'wrong-
ful' act?" under given circumstances, will be as varied as are the moral
sensibilities, natural and acquired, of the persons who answer it. To
the mind of one it will be wrong—to that of another, without wrong—
to that of another, right. The time has been when the burning of a
Latimer or Ridley was thought to be a duty, and when the hanging of
harmless and defenceless women and children was regarded by many
good people as a praiseworthy act. The time has been when to kiss
your wife on Sunday was thought to be a crime deserving punishment
and when "imagining" the death of a ruler was thought to be worthy
of death. There are people to-day living on the borders of both ex-
tremes in their views of right and wrong. Such people occasionally do,
and are always liable to, perform service as jurors. It certainly can
not be the object of the law to leave to the unguided sense of such jurors
a determination of the "wrongfulness" of an act on which depends the
guilt or innocence of a citizen of a heinous crime. It would be in
effect to authorize a jury to make, and then apply to the particular case,
a rule of right or wrong; and the guilt or innocence of the accused
would turn not on the real nature and quality of his act, but upon the
point of view from which the jury looked at his act. The decisions of
this court as we understand them, do not sanction the practice of leav-
ing it to a jury ˙to determine, unaided by instructions from the court to
guide them, the nature and quality of an act which will deprive a per-
son whose life is in danger of the right of self-defense; but they require
the trial judge to define and point out from the evidence in the par-
ticular case the wrongful act which will make a homicide a crime when
without such act it would not be a crime. Morgan v. State, 34 Texas
Crim. Rep., 226; Mundine v. State, 37 Texas Crim. Rep., 16; Carter
v. State, 37 Texas Crim. Rep., 470; Wright v. State, 37 Texas Crim.
Rep., 565; Airhart v. State, 40 Texas Crim. Rep., 470; Franklin v.
State, 30 Texas Crim. App., 628; Wrage v. State, 54 S. W. Rep., 602;
Massie v. State, 51 S. W. Rep., 250.

*A. G. Greenwood, Campbell & McMeans,* and *Rob't A. John,* Assistant Attorney-General, for the State.—The State submits that the original grand juror Tucker was disqualified, in that he was a prosecutor upon the accusation against appellant; and upon the challenge of the State was properly set aside. This challenge was acquiesced in by appellant, when he objected to the court replacing this grand juror upon the panel after the State had withdrawn its challenge. Code Crim. Proc., art. 401. The State further submits that the challenge to this particular individual having reduced the panel below twelve, the court was authorized to order the summoning of another grand juror to complete the panel, under article 403, Code of Criminal Procedure, and as far back as the Sixth Texas Reports (see State v. Jacobs, 6 Texas, 99), Judge Lipscomb says, that the withdrawal of illegal jurors having reduced the jury under thirteen (the lowest number constituting a grand jury under the old law) "it would have been competent for the court to have made up their number by drawing a sufficient number from the original venire, if it had not been exhausted, and if it had been, by summoning others for that purpose."

The court below, acting under the advice of the State in its rulings had upon the impanelment of the grand jury which returned the bill against appellant, acted upon the authority quoted by appellant in his brief of Trevinio v. State, 27 Texas Criminal Appeals, 377, which appellant in his brief admits is an authority against him, and which he earnestly contends should be overruled in this case. That authority holds substantially as follows: "That when a grand jury has completed its labor and as a body has been discharged for the term by the court, as a body it ceased to exist; and its autonomy and personnel are in a measure, if not completely, changed and destroyed when it is sought to reassemble." This is based upon article 411, Code of Criminal Procedure. It is therefore not the reassembling of the old grand jury, but it is the reconvening of a new grand jury, a distinct and different body, authorized by article 411 to be organized under the rules prescribed by law for beginning the grand jury in the first instance. Now, if the proposition be true that the reassembling of a grand jury is to be deemed the organization of an entirely new body, then it may be conceded that, as far as possible, the grand jury shall spring from the original sixteen selected by the jury commissioners for that purpose, as was done in the Trevinio case, supra, which was specifically upheld. The judge in this case followed the Trevinio decision in every particular, except he did not order the sheriff to summon the original panel of sixteen, but ordered him to summon the twelve of the sixteen which had composed the original grand jury. To this, however, appellant made no complaint at the time of the impanelment of the grand jury, as shown by Judge Lipscomb's qualification to appellant's bill. If appellant desired the grand jury that was to present the indictment against him to be composed only of those to be selected by the jury commissioners, it was his duty to challenge the twelve tendered, and in that event

his challenges are limited by article 400, Code of Criminal Procedure, to the two grounds specifically named, to wit: The first ground of which is, "That the persons summoned are not in fact the persons selected by the jury commissioners;" and the second ground is solely directed towards talesmen, and must be based upon corruption. This challenge to the array must be in writing. Kemp v. State, 11 Texas Crim. App., 174. Appellant did not attempt to challenge the array in writing on the first ground,—the only ground appellant could insist was violated, can not be urged, because the twelve jurors chosen were each and every one persons selected by the jury commissioners. The presumption and intendment being always favorable to the ruling of the court, it is appellant's duty to show that the other four jurors selected by the jury commissioners composing the panel, were within reach of the process of the court and were qualified grand jurors. The presumption is strengthened by the fact that these four had for some reason not been summoned by the sheriff when the original body was organized, or if summoned and present, had been excused by the court, and whether the failure to summon was because they were beyond the process of the court, or if excused upon evidence that they were disqualified from sitting as grand jurors, the record is absolutely silent. Therefore the presumption remains that Judge Lipscomb acted properly, and within the bounds of the statute when he ordered the sheriff to summon the twelve who had composed the original body. In any event these twelve were tendered, and appellant, neither in writing, as the Kemp case, supra, says he must, nor orally, objected to the panel; but on the other hand, by his conduct, joined in by the State in the challenge of the particular juror Tucker; and this juror being challenged and the court having sustained the same peremptorily, as the law authorized him (article 402), the court was authorized under article 403 to fill the vacancy by ordering new jurors. This was done, the jury was properly impaneled and sworn, and under the Trevinio case, supra, it is respectfully submitted that the action of the court was proper and the grand jury was valid.

As to the sufficiency and correctness of the charge of the court upon self-defense the cases cited were Gonzales v. State, 28 Texas Criminal Appeals, 130; Id., 30 Texas Criminal Appeals, 324; Goodwin v. State, 39 Texas Criminal Reports, 404; Mitchell v. State, 38 Texas Criminal Reports, 170.

As to the correctness of the charge upon provoking the difficulty. The rule of law limiting the right of self-defense in provoking a difficulty does not depend upon the nature of the provocation but upon the intention of the person giving the provocation. See Penal Code, art. 708; Meuly v. State, 26 Texas Crim. App., 276; Green v. State, 12 Texas Crim. App., 445; Franklin v. State, 30 Texas Crim. App., 628.

In the Franklin case, Judge Hurt says: "But if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made

upon him, would be manslaughter under the law." That is to say, a wrongful act, which is a misdemeanor, qualifies the right of self-defense, but there being no apparent intention to kill, the qualification makes defendant guilty only of manslaughter. In the case at bar, the court with emphasis instructs the jury that the provocation must have been made not only with the specific intent to get a pretext to kill deceased, but must have been made with the view thereto, in order to make the same murder; and then charges that if they failed to find the specific or apparent intention to kill when the provocation was given, that then they will find defendant guilty of manslaughter, provided the killing was done suddenly under the immediate influence of passion, arising from an adequate cause as explained in paragraph 14 of the charge; or in other words he ties the issues as to provoking a difficulty to the offense of manslaughter, unless the jury finds the apparent or specific intent to kill when the provocation was given; and under these circumstances it was certainly not necessary after defining manslaughter and defining adequate cause, to have stated that the provocation must have been reasonably calculated under the circumstances to bring on the difficulty. Any act or word, which a person may do and which is done with the apparent intention of provoking a difficulty, and with the view thereto, for the purpose of getting a pretext to kill his adversary, will abridge the right of self-defense, even though the act done and the words spoken are not reasonably calculated under the circumstances to accomplish the same. It is not what will reasonably provoke a difficulty with persons of ordinary temper; the issue is, what did the appellant intend? What was his purpose? The circumstances of each case differing, the temperament of each person differing, an insult trivial to some may be treated seriously by others. Muely v. State, 26 Texas Crim. App., 306; Penal Code, art. 708; Gonzales v. State, 30 Texas Crim. App., 224; Jackson v. State, 32 Texas Crim. Rep., 192; Green v. State, 12 Texas Crim. App., 445.

As to the second proposition contended by appellant to be error, to the effect that the court should have grouped the facts and indicated to the jury what facts would limit or prejudice his right of self-defense, the State submits: That to group the facts and charge the jury, if they find the same exists, that then as a matter of law, appellant's right of self-defense would be abridged, would invoke a rule which if carried to its logical conclusion would make it the duty of the court to group the facts on all issues; to group the facts under the issue of adequate cause in manslaughter; to group the facts under the issue of express malice in murder; or in other words to invade the province of the jury and take from them the right to say what fact or set of facts will produce adequate cause; or what fact of set of facts was sufficient to sustain express malice; nor what fact or set of facts is sufficient to provoke a difficulty. These are solely questions for the jury.

BROOKS, JUDGE.—Appellant was indicted in Anderson County, and upon change of venue was tried in Cherokee County, was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years.

At the time the homicide was committed, in Anderson County, the District Court was in session, but the grand jury had been discharged for the term. The court set aside the order discharging the grand jury, and entered an order reassembling the grand jury. It appears that of the twelve members all were present in answer to said summons. On account of one of the grand jury, to wit, J. L. Tucker, being related to deceased, Jim Stafford, and for the further reason that said Tucker had contributed to a fund to prosecute appellant, upon the challenge of the State the court excused said grand juror. Afterwards the State withdrew its challenge to said Tucker, and the court had him recalled. Thereupon appellant objected to Tucker being recalled on the ground alone that he had been excused by the court, appellant expressly disclaiming any intention or desire to challenge him. The court then excused Tucker because of the exceptions made by the State, and partly upon his own motion. Appellant moved to set aside the indictment on the grounds: "(1) There was present one person, to wit, T. A. Gossett, not authorized by law, when the grand jury which found and presented the indictment were deliberating upon the accusation against defendant, and when said grand jury were voting upon said indictment. (2) Said indictment was found and presented by a body composed of thirteen members, and pretending to be a grand jury organized at the April, term, 1899, of the District Court of Anderson County. (3) At the time said indictment was found and intended to be presented, there was no court in session in Anderson County to which said indictment could be presented." An inspection of the record shows there is no merit in the last reason assigned by appellant for setting aside the indictment. Article 411, Code Criminal Procedure, provides: "When the grand jury has been discharged by the court for the term it may be reassembled at any time during the term, and in case of a failure of one or more of the members to reassemble, the court may complete the panel by impaneling other qualified persons in their stead in accordance with the rules prescribed in this chapter for completing the grand jury in the first instance." In order to arrive at a proper construction of this article, it is necessary to consider the previous articles of chapter 7, which relate to the organization of the grand jury. It is conceded by appellant that if the juror Tucker, who was excused by the court, had not been present, then the very terms of article 411 would have authorized the court to have another juror summoned and impaneled in lieu of the juror Tucker; appellant's insistence being based upon the fact that the grand juror Tucker was present and stated his relation to deceased, and that he had subscribed to a fund to prosecute appellant, and that these reasons were not sufficient to authorize the discharge, and that the court could not have dis-

charged him for any character of reason, he being present. In other words, appellant's contention is that the grand jury, when once organized, remains as it is then organized during the entire term of the court, regardless of the fact that the judge has discharged them for the term and reassembled them. When a grand jury is discharged by the court for the term, it is functus officio, to to speak. In other words, it ceases to exist, unless the court sees fit to reassemble it as provided in article 411; and, when article 411 provides that on the "failure of one or more of the members to reassemble the court may complete the panel," this clause certainly does not mean the mere physical presence of the grand juror, but, if he is disqualified for any of the reasons set forth in chapter 7, then the court, upon his sound discretion, or motion of the district attorney, or upon proper legal exception by appellant himself, can discharge the grand juror. See Trevinio v. State, 27 Texas Crim. App., 372. In other words, we hold that article 411 authorizes the court to organize the grand jury as it did in the first instance. Appellant in his able brief, concedes that if the case of Trevinio v. State, 27 Texas Criminal Appeals, 372, is the proper construction of this article, then his insistence is without merit. We there held that: "After a grand jury has completed its labor, and as a body has been discharged for the term of the court, as a body it ceases to exist, and its autonomy and personnel are in a measure, if not completely, changed and destroyed when it is sought to reassemble them. We think it clear from the phraseology of the statute that it was within the contemplation and intention of the Legislature that when the grand jury was reassembled they could only be organized and impaneled with twelve men; that there must be at least that many persons; that no less number would suffice, and if there were not twelve present, the number could be completed by impaneling other qualified persons in their stead." To hold otherwise than as above would be depriving appellant and the State of subdivision 2, article 401, wherein the statute provides that a grand juror is disqualified if he is a prosecutor upon the accusation against appellant. It is an axiomatic rule of statutory construction that the Penal Code must be construed as one harmonious whole, if it can be done. To give article 411 the construction insisted on by appellant would be defeating the very object, purpose, and intent of said article, since the evident intent of the Legislature was to provide a quick and expeditious manner and means of reorganizing the grand jury for the purpose of investigating crimes that may have occurred between the time of the discharge of the grand jury and their reassembling. Suppose all twelve of the jurors were summoned, and all were present, and all were very sick; could it be seriously urged that the court could not discharge that grand jury and order the sheriff to summon another? If so, then the statute might, in all human probability, be rendered ineffectual and void by one of the usual incidents of life. We are not warranted in giving it this construction, but believe the clear import of the language, coupled with the other articles

in said chapter 7, leaves no doubt of the fact that, if the grand juror is present and unable to serve, "the court may complete the panel by impaneling other qualified persons in their stead in accordance with the rules prescribed in this chapter for completing the grand jury in the first instance." Appellant further insists that the Trevinio case, supra, is overruled by Gay v. State, 40 Texas Crim. Rep., 242. In that case appellant made a motion to quash the indictment "on the ground that the grand jury finding the bill had previously been adjourned for the term, and, when it was reassembled, that it was not then impaneled and sworn according to law, and, furthermore, that when it was reassembled it was not composed of the same grand jurors which had been impaneled at the beginning of the court; that one Howard Miller's name did not occur on the list, but that the name Howard Wagner occurred twice. It was shown as to this that the name Howard Wagner occurred twice by mistake, and that Howard Miller's name should have appeared in one place instead of the name of said Wagner. This sufficiently shows that it was the same identical grand jury which had been originally impaneled at the beginning of said term of court, and it was not necessary, when they were reassembled, to reimpanel them; that is, it was not necessary to go through the formality of testing them as to their qualifications, and reswear the members of said grand jury. Article 411, Code of Criminal Procedure, 1895, controls this matter, and, it is apprehended, where the constituents of the grand jury reassembled are the same, that the court shall do no more than set aside the order discharging the grand jury, and then order their reassembling. Of course, it would be different where the original grand jury does not attend, and other persons are summoned to fill out the original panel." We do not see any conflict between the excerpt quoted from the Gay case and the Trevinio case. In the Gay case we hold that where all the grand jury are reassembled, and none of them are set aside for any reason, the mere discrepancy in stating the name of one does not affect the panel, nor is it necessary to reswear them, since they have all been sworn touching their qualifications as grand jurors. However, in the case at bar, while the juror Tucker appeared, he was disqualified under the statute from sitting, and when he was discharged another grand juror was placed in his stead, and the panel was then and there completed, and made and constituted a constitutional grand jury, under the laws of this State. We therefore hold appellant's motion to set aside the indictment was properly overruled.

Appellant insists the court erred in giving the following charge to the jury: "Homicide is permitted by law and is justifiable when inflicted for the purpose of preventing the offense of murder, maiming, disfiguring, or other serious bodily injury, when the killing takes place under the following circumstances: (1) It must reasonably appear by the acts, or by words coupled with the acts, of the person killed, that it was the purpose and intent of such person to commit one of the offenses above named; (2) the killing must take place while the per-

son killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense. So, upon this issue, you are charged that the defendant would be justifiable in killing deceased, if it is shown to have been done to prevent the deceased from murdering, maiming, or disfiguring him, or if it is shown that at the very time of the killing, or immediately preceding such killing, the deceased, Jim Stafford, had made, or was in the act of making, some hostile demonstration towards defendant, such as produced in his mind a reasonable fear or expectation of death or of some serious bodily injury; but in that case, to justify the killing, it must reasonably appear from the acts, or words coupled with the acts, of the deceased, that he intended to murder, maim, disfigure, or inflict some serious bodily injury upon defendant, and the killing must have taken place while deceased was in the act of committing such offense, or after some act done by him showing evidently an intention to commit such offense. Therefore, if you believe from the evidence that defendant at the time of the homicide believed that his life was in danger, such fear being produced by hostile acts on the part of deceased, and that at the time he fired the fatal shot (if he did so) it reasonably appeared to defendant; from all the circumstances of the case, viewed from defendant's standpoint alone, that deceased was about to shoot him with a pistol, then defendant would be justifiable in killing deceased; and if you so believe, you will acquit defendant, though it may appear as a fact that defendant was in no danger at the time of the homicide." Appellant objects to the above quoted charge: "(1) Because it was calculated to mislead and confuse the jury as to the burden of proof to show the existence of circumstances which would justify him in killing deceased. (2) That fairly and reasonably construed, it devolved on defendant the burden of showing the existence of such circumstances. (3) That it required the jury to believe from the evidence that deceased was killed while in the act of committing the offense of murder, maiming, or disfiguring, or after some act done by him showing an intent evidently to commit such offense, whereas the law is that if defendant killed deceased at a time when it reasonably appeared to him deceased was in the act of either murdering, maiming, or disfiguring him, or inflicting upon him some other serious bodily injury, he would have been justified in killing him. (4) That it required the jury to believe from the evidence that defendant, at the time he may have killed deceased, believed his life was in danger, when the law is that, if he either believed his life was in danger or that he was in danger of serious bodily harm at the hands of deceased, he would have been justified in killing him. (5) In applying the law to the case in said charge, the court limited the apprehension of danger in the mind of defendant to such as might have been produced by 'hostile acts' on the part of the deceased, and did not extend the principle to the 'words coupled with the acts' of the deceased. (6) In applying the law to the case in said charge, the court limited the right of defendant to act

'at the time he fired the fatal shot' to a defense against an assault upon him by deceased, and did not extend the principle to a threatened assault on the part of deceased, indicated by acts, or words coupled with acts, of deceased, reasonably calculated to produce in the mind of defendant a fear of death or serious bodily injury." We do not think the court's charge is subject to the criticism made by appellant, and, without at this time reviewing the facts in detail, hold that the same was peculiarly applicable to the facts of this case. It is not necessary for the court to place the reasonable doubt at the end of each charge. Edens v. State, 41 Texas Crim. Rep., 522. We note that the court charged upon the appearances of danger, and the mere absence of a statement in the charge that appellant had a right to defend against "danger of serious bodily harm" would not authorize the reversal of a case, unless there was some evidence showing that the assault was one intended to inflict serious bodily harm, and not death. In other words, the evidence in this case shows that deceased, as testified by appellant, made an assault upon him with a pistol, and that appellant shot deceased to save his own life. This being the testimony, it certainly was harmless error, if error, to fail to charge on the doctrine of serious bodily injury. In Mitchell v. State, 38 Texas Crim. Rep., 170, appears the following: "Appellant complains because the court, in his charge, limited his right of self-defense to an assault with intent to kill him, made by deceased, or to some act done by deceased showing evidently that he intended to kill defendant. The vice suggested by this charge is that, if deceased was doing some act which indicated that his purpose was to inflict serious bodily injury upon defendant, his right of self-defense against such an attack would be equally perfect. If there was any testimony in the case showing that deceased, if he made an assault on defendant, had a less purpose than an intent to take his life, the contention would have great force, but there is no such testimony in this case. If deceased was in the act of making an assault on defendant at all, it was for the purpose of taking his life,—he was about to shoot him with a pistol; and we fail to understand how the charge in question could have injured the rights of appellant." The above quoted language could with equal force be applied to the facts of this case, and hence we hold that there is no error in the charge complained of. See, also, Gonzales v. State, 28 Texas Crim. App., 130, and 30 Texas Crim. App., 203.

Appellant also insists that the court erred in his charge on the law of provoking the difficulty. In order to present this question fully, we will make a short statement of the evidence as detailed by the main prosecuting witness, Sadler. "Witness and deceased were sitting in the sheriff's office, in the jail. Appellant drove up in a buggy, close to the sidewalk by the jail, and called to deceased: 'Jim Stafford, come out here. I want to see you.' Deceased complied, and as deceased reached the edge of the street, and just as witness got to the jail door, appellant got out of his buggy, turning his back west, in

the direction of his horse's head, and stood about halfway between its head and the front wheels of his buggy; placing his left hand either on the shaft or harness; dropping his right hand down by his right hip pocket. Witness at this time was coming down the steps of the jail, and deceased had taken three or four steps into the street, towards appellant, when appellant said: 'By God, I want to know what you all were doing over there last night, meddling with my business.' Deceased replied: 'I was not meddling with your business. I was only discharging my duty with Mr. Cook' (or 'under Mr. Cook,' I don't know which). Defendant replied: 'God damn you! I want you to understand, by God! I am running' (or 'attending to') 'that town; and, by God! I want you all to stop meddling with my business' (or 'affairs'). I think he said 'affairs.' Deceased replied, 'Ed, I have not meddled with your business. I have only been trying to discharge my duty, which I expect to do as long as I hold my place.' Defendant replied: 'God damn your souls! I not only want you to quit meddling with my business, but to stay away from over there.' Deceased then said: 'Ed, I don't want any trouble, but, by God! I will discharge my duty.' Defendant replied: 'God damn you! get out from here,' pulled his pistol, and fired at deceased. When the shot fired, deceased staggered backward a short step, and then at once stepped forward, and, as he took the first step forward, pulled his pistol." The statement of facts further shows that appellant was the city marshal of Palestine, and deceased was deputy sheriff; that appellant was angered at efforts on the part of deceased and the sheriff of the county to enforce the gambling laws, and this appears to have been the basis of the difficulty on the fatal morning. In presenting the issue of provoking the difficulty, the court charged the jury as follows: "You are further instructed, as a part of the law of self-defense, that if a person, by his own wrongful act, brings about the necessity of taking the life of another to prevent himself being killed, he can not claim that such killing was in his own necessary self-defense, but the killing in such case will be imputed to malice, by reason of the wrongful act which brought it about, or malice from which it was done. The law is that he who brings on an affray in which he intends to wreak his malice can not avail himself of the shield of self-defense, though his own life be imperiled in the affray, and that the slayer, if he provoked the contest or produced the occasion with the intention of killing deceased or of doing him some serious bodily harm, is guilty of murder, although he may have done the act of killing suddenly, without deliberation, to save his own life. In such case the law allows no justification, and no reduction of the grade of the homicide below that of murder. If you believe, therefore, beyond a reasonable doubt, that defendant by his own wrongful act brought about the necessity of killing deceased, intentionally and with a view thereto, or if defendant provoked the difficulty with the intention of taking the life of deceased, intentionally and with a view thereto, and that under

such circumstances he shot and killed deceased, then the homicide would be murder in the first or second degree, according as the facts and circumstances may justify the jury in finding, even though he may have done the act of killing suddenly and to save his own life. But if defendant provoked the difficulty that resulted in the death of deceased, or by his own wrongful act produced the necessity for taking the life of deceased, but with no intention to kill deceased or to inflict upon him some serious bodily harm, and suddenly, under the immediate influence of sudden passion arising from an adequate cause, as explained to you in paragraph 14 of this charge, he shot and killed deceased, then you will find defendant guilty of manslaughter," etc. Appellant excepted to said charge: "(1) That it is not every wrongful act which brings about the necessity of taking life to preserve his own that will deprive the slayer of his right of self-defense. (2) That it is not the law, without ·qualification, that he who brings on an affray in which he intends to wreak his malice can not avail himself of the shield of self-defense. (3·) That it is not the law, without qualification, that one who provokes a contest, or produces the occasion to kill another or do him some serious bodily harm, with intent to do so, is guilty of murder, although he may have done the act of killing suddenly, without deliberation, to save his own life. (4) That it is not the law, without qualification, that a defendant who by his own wrongful act brings about the necessity of killing deceased, intentionally and with a view thereto, or provokes a difficulty with the intention of killing deceased, intentionally and with a view thereto, is guilty of murder. (5) That it is not the law, without qualification, that if defendant provoked the killing resulting in deceased's death, or by his own wrongful act produced the necessity for killing deceased, but with no intention to kill him or inflict upon him serious bodily harm, he would be deprived of his right of self defense, and be guilty of manslaughter, if he suddenly, and under the influence of sudden passion arising from an adequate cause, shot and killed deceased. (6) That as a part of the law on the issue of provoking a difficulty, the court should have charged the jury: First, as to the kind and character of wrongful acts on the part of defendant which would deprive him of his right of self-defense; second, as to the effect on defendant's right of self-defense where the provocation, if any, of deceased, reasonably should not have arisen from defendant's acts, if any; and, third, should have indicated from the evidence what act or acts of defendant would have been sufficient to provoke a difficulty and deprive him of his right of self-defense, and should have defined the effect and bearing of such act or acts of defendant upon the case, instead of leaving it to the jury to speculate and conjecture as to the nature and quality of such act or acts, and the extent of its or their limitation and abridgement of defendant's right of self-defense." Appellant, in support of his contentions, cites Wrage v. State, 41 Texas

Crim. Rep., 369; Airhart v. State, 40 Texas Crim. Rep., 470; Mozee v. State (Texas Crim. App.), 51 S. W. Rep., 250. A close scrutiny of these cases will show that the main point decided in these cases was the error of the court in charging the jury that, if appellant sought a difficulty with the intention of provoking same, then he would forfeit his righth of self-defense, etc. These cases were passing especially upon this proposition, and properly held it was error for the court to tell the jury that the mere seeking of an adversary for the purpose of provoking a difficulty per se forfeits appellant's right of self-defense. Appellant must not only seek his adversary for the purpose of provoking the difficulty, but he must provoke the difficulty at the time he meets deceased, before it can be claimed that he has forfeited his right of self-defense. This is the real point at issue, and that was decided in the above cases. However, we note in Carter v. State, 37 Texas Criminal Reports, 404, and perhaps other cases cited in Mozee v. State, supra, that there seems to be a holding supporting appellant's contention that it is necessary for the court to state the acts, facts, and circumstances indicative of the fact that appellant has provoked the difficulty. But we think, in the main, that said statements are dicta, and do not present a sound proposition of law. It is not necessary for the court, in charging upon provoking the difficulty, to tell the jury the facts upon which they can find appellant has provoked the difficulty. This would be, in the main, impracticable, since the facts and circumstances are so interwoven that it is impossible for the trial court to single out certain evidence indicating that appellant has provoked the difficulty, without charging or appearing to charge upon the weight of evidence. We think the proper practice is that pursued by the trial court in this case; that is, to tell the jury that if appellant provoked the difficulty with the intention to kill, then appellant would be guilty of murder in the first or second degree, according to the facts, or, if appellant provoked the difficulty without such apparent intention, he would be guilty of manslaughter. We note, also, appellant's insistence that the charge is wrong in that the court did not tell the jury what the effect upon appellant's right of self-defense would have been where the provocation, if any, of deceased reasonably should not have arisen from defendant's acts, if any. In other words, we understand that appellant insists, if the provocation offered by appellant is not such as is reasonably calculated to provoke a difficulty, then appellant would not be deprived of the right of self-defense. We understand this to be the law, to wit: Appellant may intend to provoke a difficulty, yet the means used to do so may not reasonably be calculated to provoke one; still, if appellant intended to provoke a difficulty, and the means used did provoke it, clearly he is responsible for what he actually intended to do. This is clearly the law. Suppose appellant makes a statement reasonably calculated to provoke a difficulty, but he did not intend to do so; his right of self-defense would not be forfeited, although the statement

made was calculated to bring about a difficulty. Clearly, then, the converse of the proposition holds good. That is, if appellant intends to provoke a difficulty, and he uses such means as he thinks will provoke the difficulty, and it does provoke it, then it is immaterial whether the means used to provoke the difficulty were reasonably calculated to do so or not. In other words, the whole matter turns upon appellant's intent, and the results of his intent. Our law is all based upon the intent of appellant. We think the charge of the court is correct and applicable to the facts. Green v. State, 12 Texas Crim. App., 445; Meuly v. State, 26 Texas Crim. App., 306; Jackson v. State, 32 Texas Crim. Rep., 192; Penal Code, art. 708. We have frequently approved charges on provoking the difficulty where the court failed to group the facts. Alexander v. State, 40 Texas Crim. Rep., 395; Mundine v. State, 37 Texas Crim. Rep., 16; Tollett v. State (Texas Crim. App.), 55 S. W. Rep., 573; Swanner v. State (Dallas term, 1900), 58 S. W. Rep., 72. We also note that appellant insists the court should have charged on the law of retreat. There is no evidence raising that issue.

We have carefully examined appellant's bills of exceptions and other assignments of error, and, without reviewing them seriatim, we find no error in the matters complained of. The facts are amply sufficient to supporrt the verdict, and the judgment is in all things affirmed.

*Affirmed.*

HENDERSON, JUDGE (Dissenting).—Inasmuch as I deem the principal question discussed by the court, to wit, the impanelment of the grand jury which found the bill of indictment, important, as being jurisdictional, and differing as I do as to this matter with the conclusion reached by the court, I consider it proper to present my views on the question.

The indictment was found by a purported grand jury of Anderson County. The term of the district court at which the indictment was presented began on the 24th day of April, 1899, and the grand jury for the term was duly organized, impaneled, and sworn at said time. Said grand jury was afterwards, during the same term, on the 22d of May, discharged; having reported to the court that they had completed their labors. On June 20th thereafter the court ordered the said grand jury to reconvene. The sheriff was directed to resummon the said twelve men composing said grand jury. Afterwards, on the 26th of June, 1899, all twelve of the members composing said grand jury reported to the court. One of the original twelve, to wit, J. L. Tucker, appears to have been challenged by the State as a grand juror, on the ground that he was related to Jim Stafford, deceased (the grand jury being recalled to investigate his death), and also that he had contributed to a fund to prosecute accused, Ed Matthews. The court sustained the challenge. The court on some account recalled Tucker, and appellant objected to the court recalling him, stating at the same time that he did not wish his objection to be

construed as a challenge; that he did not challenge him. Thereupon the judge ordered said grand juror to stand aside, partly on his own motion, and partly because of the challenge by the State. Talesmen were ordered to fill up the panel, and T. A. Gossett was brought in and found to be a competent juror, and was substituted in the place of said Tucker, and the jury was then sworn, to all of which appellant reserved his bill of exceptions. This grand jury, as thus organized, subsequently, on July 29, found the bill of indictment against appellant for the murder of said Jim Stafford. Said homicide was committed on June 15, 1899. This is about the shape of the case as presented in the two bills of exception on the subject, and raises sharply the question whether or not the grand jury which found this bill of indictment was a legal grand jury. A majority of the court are of opinion that it was, and I understand their view to be based on the construction of our statutes on the subject as construed in Trevinio v. State, 27 Texas Criminal Appeals, 372. I have read that decision carefully, and, in my opinion, it is not a legitimate construction of the statutes; and, notwithstanding my respect for the court and able judge who rendered that opinion, I believe it is an interpretation of the statute unauthorized by law. The effect of that decision is to constitute a new grand jury, and to reimpanel and reswear such new grand jury. However, I do not propose to analyze or discuss what I consider fallacies in said opinion, further than is involved in my interpretation of our statutes, on the subject of the original impanelment of the grand jury for the term, and the authority to reassemble said grand jury.

The grand jury system is of very ancient origin,—almost coeval with the birth of the common law itself. It was brought by our ancesters across the water from England, and in the early history of our government entered into and became a part of our criminal jurisprudence. However, its origin or antiquity has nothing particularly to do with this question. As far as we are concerned, it is regulated by our Constitution and by our statutes. Our Bill of Rights (section 10) provides that "no person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary," etc. Section 13, article 5, provides that the grand juries shall be composed of twelve men, but nine members of a grand jury shall be a quorum to transact business and present bills. Our statutes on the subject of grand juries, so far as need be noted, are embraced in the Code of Criminal Procedure, from article 372 to article 411, inclusive. These relate to the qualifications of grand jurors; how they shall be drawn by jury commissioners appointed by the court; how they shall be summoned and tested as to their qualifications, impaneled, and sworn. The judge is authorized to appoint jury commissioners, who shall select grand jurors for the succeeding term of the court. It is also provided that in case there is a failure to select a jury at the preceding term, from any cause, the judge may order the sheriff to summon

a sufficient number of persons, not less than twelve nor more than six-teen, to serve as grand jurors, and from these the panel of twelve is to be selected. Or if there is a failure on the part of any of the jurors drawn by the jury commissioners to attend, and the panel of twelve is not filled out by those who do attend, the judge is authorized to require the sheriff to summon a sufficient number to complete the panel. Among other things, it is provided in article 396 that, when twelve qualified jurors are found to be present, the court shall proceed to impanel them as a grand jury, unless a challenge is made, which may be made to the array or to any particular individual presented to serve as a grand juror. Article 397 provides that: "Any person, before the grand jury has been impaneled, may challenge the array of jurors, or any person pre-sented as a grand juror, and in no other way shall objections to the qualifications and legality of the grand jury be heard. Any person con-fined in jail in the county shall upon his request be brought into court to make such challenge." Then we have a definition of the array, and how that is to be challenged, which does not concern us here. Then article 401 provides for the challenge to particular jurors: "A chal-lenge to a particular grand juror may be made orally, and for the fol-lowing causes, only: (1) That he is not a qualified grand juror. (2) That he is the prosecutor upon an accusation against the person making the challenge. (3) That he is related by consanguinity or affinity to some person who has been held to bail, or who is in confinement upon a criminal accusation." When a challenge to the array or to any indi-vidual juror has been made, the court is authorized to hear proof and decide the same; and if sustained, and the number of grand jurors thus reduced below twelve, the court is authorized to order the panel filled out, or another grand jury summoned, as the case may be. It is further provided, in accordance with the Constitution, that nine members shall constitute a quorum for the purpose of transacting business and pre-senting bills of indictment. Article 411 reads as follows: "When a grand jury has been discharged by the court for the term, it may be reassembled by the court at any time during the term, and in case of failure of one or more of the members to reassemble, the court may complete the panel by impaneling other qualified persons in their stead, in accordance with the rules prescribed in this chapter for completing the grand jury in the first instance." I have quoted so much because I think all these statutes are pertinent, as bearing on the question at issue. It will be well to note here that the statutes speak of the grand jury for the term, and, before the enactment of said article 411, the practice, in contingencies when the grand jury had been discharged, of reassembling them, was by setting aside the order discharging them, and ordering their reassembling. Wilson v. State, 32 Texas, 112; Mitchell v. State, 43 Texas, 512; Newman v. State, 43 Texas, 525. And as far back as State v. Jacobs, 6 Texas, 99, it was held that a venire facias issued to summon a new grand jury while the first is recognized as a legal grand jury, and before any steps are taken to set aside the

first, is illegal. It will also be well to note that this court, in constru-
ing the power of the court with reference to a grand jury after it has once
been impaneled and sworn for the term, has held that the court has no
authority to excuse one of its members for the term, and an attempt to
thus excuse a member permanently is an absolute nullity, and could not
operate to destroy the autonomy of the grand jury as originally con-
stituted. Such an attempted excuse could not discharge the juror, and
the law would still consider him a member of the grand jury. Smith
v. State, 19 Texas Crim. App., 444; Watts v. State, 22 Texas Crim. App.,
572; Drake v. State, 25 Texas Crim. App., 293; Jackson v. State, 25
Texas Crim. App., 314. Under these authorities, I apprehend it will
be conceded, if appellant had committed this homicide while said grand
jury was in session, never having been discharged, and he had been
arrested and brought into court, and had then craved the right to chal-
lenge the array of said grand jury or to challenge any particular grand
juror, that it would not have been permitted, simply because there would
have been no law authorizing this procedure, no matter how well founded
his cause of challenge may have been. He could only make his chal-
lenge when the grand jury was being organized, and not afterwards,
because this is his statutory right, and the statute gives him no other.
If this be a sound interpretation of the law, then I ask by what author-
ity, if the same grand jury organized at the beginning of court has been
discharged and then reassembled, has the defendant the right to then
challenge either the array or any particular grand juror? If he has
such right, he must get it, not by statute, but by judicial legislation.
The argument ab inconvenienti has no place here. The procedure
carved out by our Legislature must govern us. A plain reading of the
statute shows that no new grand jury is to be organized after its dis-
charge, but the same grand jury organized at the beginning of the term
is to be reassembled. They have already been tested and sworn. This,
according to the definition of our statute, means the impanelment of
the grand jury. Art. 399, Code Crim. Proc. And it is provided that,
if all this panel of grand jurors (not the sixteen original grand jurors
from which the panel was formed, but the twelve) shall reassemble,
that is the grand jury. And as was said in Gay v. State, 40 Texas
Criminal Reports, 242: "It is not necessary to go through the formal-
ity of testing them as to their qualifications, and reswear the members
of said grand jury. All that is necessary is for the court to instruct
them and send them about their business." The statute provides only
one contingency in which the court can depart from this rule; that is,
should one or more of the members composing the said grand jury be
absent, then the court is authorized to have others summoned to fill up
the panel,—that is to complete the grand jury of twelve, including those
members of the original panel who are in attendance. Applying the
rule expressio unius here, it would certainly suggest that this is the
limitation of the authority of the court with reference to constituting

new members of the grand jury, and would inhibit the court from pursuing any other method in the completion of said grand jury.

It is said that if one or more grand jurors are actually present, but they are sick, certainly the court would have the right to excuse them; that is, though actually present, they are constructively absent. This would be worse than Speaker Reed's construction of the rules, about which we so much complained, because he found the truth ·when he counted as present members who were actually present but who refused to answer the roll call. But here we have a fiction founded in a fallacy; that is, we assume that a juror actually present is constructively absent. This kind of reasoning will not do. My answer to the whole proposition is that the authority of the court is measured by the statute, and I find no authority for the court of its own motion to create a grand jury. As Judge Roberts said in Newman v. State, 43 Texas, 528, that he knew of no authority, "either on principle or practice, for issuing a venire to enable the sheriff to select a new grand jury after that for the term had been discharged." . This was simply tantamount to saying that the court in this regard was regulated by statute. A grand jury, under our system of jurisprudence, means something, and it must be constituted according to the rules of law prescribed for its organization; and if this is departed from so as to break the autonomy of the legal grand jury, the effect will be either to add to the number of jurors and increase the jury beyond the constitutional limit, or to substitute a legal grand juror by a person not authorized to sit or be with the grand jury. In either event it would be without authority of law. The incompetency of one grand juror is sufficient to render an indictment found by it null and void. State v. Foster, 9 Texas, 65; 10 Enc. of Pl. and Pr., 355, note 3, for authorities. And it has been repeatedly held that where an indictment is found by a grand jury composed of a greater number than twelve jurors, as required by the Constitution, it is null and void. Ex parte Reynolds, 35 Texas Crim. Rep., 438; Harrell v. State, 22 Texas Crim. App., 629.

It is said, however, that the courts must go on, and any other construction than that claimed would be productive of great delays. I can not so regard it, even if this was a sound argument to be invoked in the construction of our statutes regulating grand juries. The fact is, if appellant had been brought before the grand jury when it was first organized, at the beginning of the term, he would not have been authorized to challenge the grand juror Tucker because of his relationship to the deceased, because this is not provided for by our statutes. He could only be challenged on the ground of relationship if he was related to the appellant himself. As having contributed to the fund to prosecute, he may have been considered in the light of a prosecutor, and so amenable to a challenge. But the relationship, or the fact that a juror was a prosecutor, while it might have been a ground of challenge in the original organization of the grand jury, yet it would not vitiate the indictment found by said grand jury. 10 Enc. of Pl. and

Prac., 357, and authorities cited in note 1, p. 358. It does not occur to me that there is or was any exigency to place this forced construction on our statutes regulating grand juries. The reading of the same is plain enough, and the working of said statutes is harmonious, when taken together. Nine members constitute a quorum for the transaction of business and presentation of bills. The foreman is authorized to excuse members from day to day, which is applicable to almost every exigency liable to happen to members of grand juries. And if the grand jury could not in fact be reassembled, on some account, it would be a rare exigency in which the prisoner could not be held to bail or in custody until the succeeding term of the court. In my view, the court, in standing the grand juror Tucker aside, either of his own motion or on the challenge of the State, and impaneling in his stead Gossett, acted without authority of law. He destroyed the autonomy of the grand jury, and the body which found this bill was, in my opinion, not a legal grand jury, and its presentation of the indictment was without authority of law, and null and void.

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]