### Geary Atkison v. The State.

#### No. 3922. Decided January 26, 1916.

#### Rehearing denied February 16, 1916.

1.—Murder—Manslaughter—Sufficiency of the Evidence.

Where, upon trial of murder and a conviction of manslaughter, the evidence sustained the conviction, under a proper charge of the court, there was no reversible error.

2.—Same—Leading Questions—Unwilling Witness.

Where the State's witness was decidedly adverse to the State, there was no error in permitting State's counsel to ask him leading questions. Following Carter v. State, 59 Texas Crim. Rep., 73.

3.—Same—Impression of Witness.

Upon trial of murder, there was no error in refusing to permit defendant's counsel to ask the witness and have him answer as to the impression which was made upon his mind by the deceased at the time he saw him with a gun, and that he believed that deceased intended to go and shoot the defendant.

4.—Same—Charge of Court—Self-defense—Provoking Difficulty.

Where, upon trial of murder, the court submitted an admirable charge upon murder, manslaughter, self-defense and provoking the difficulty, all of which were raised by the evidence, there was no reversible error. Following Woodward v. State, 54 Texas Crim. Rep., 86, and other cases.

5.—Same—Charge of Court—Manslaughter—Theory of Defense.

Where, upon a trial of murder and a conviction of manslaughter, the defendant objected to the court's charge because it did not also submit a charge on manslaughter, on the theory that deceased's attack of him with a knife produced that degree of passion to render him incapable of cool reflection, but the

record showed that defendant asked no special charge submitting manslaughter under any such theory, and the court's main charge on manslaughter was applicable to the facts, there was no reversible error; the defendant having been convicted of manslaughter.

**6.—Same—Charge of Court—Self-defense.**

Where defendants' requested charge on self-defense was embraced in the court's main charge, there was no error in refusing same. Neither did the court err in refusing a requested charge about defendant's right to arm himself with a pistol, as the evidence did not properly raise this issue.

**7.—Same—Provoking Difficulty—Charge of Court—Motion for Rehearing.**

Where appellant in his motion for rehearing contended that this court erred in holding that the lower court was justified in charging on provoking the difficulty, but the evidence in the record clearly raised this issue, there was no error in overruling the motion for rehearing. See opinion for facts set out which raised the question of provoking the difficulty, and that it was the duty of the court to charge on that issue; the court in the meantime submitting the converse of the proposition.

Appeal from the District Court of McCulloch. Tried below before the Hon. John W. Goodwin.

Appeal from a conviction of manslaughter; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Woodward & Baker* and *Joe Adkins,* for appellant.—On question of provoking the difficulty: Barbee v. State, 34 Texas Crim. Rep., 129; Timon v. State, 34 id., 363.

On question of the court's charge on manslaughter: Mundine v. State, 37 Texas Crim. Rep., 5; Ross v. State, 53 id., 277; Cooper v. State, 48 id., 36; Castro v. State, 40 S. W. Rep., 985.

On question of self-defense: Pate v. State, 54 Texas Crim. Rep., 462; Trotter v. State, 37 id., 468; Hightower v. State, 56 id., 248.

*C. C. McDonald,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at five years in the penitentiary.

The State's evidence was amply sufficient to show that just about or before night appellant with some companions was in a drug store in the town of Stacy preparing to take a drink of "coke." Deceased, Eli Brown, who was on a visit to his sister, who ran a hotel and restaurant, went from the restaurant into the back of the drug store to get a bucket of water. In doing so he passed appellant, who hailed him, and he responded. Upon getting the bucket of water, deceased was returning to the restaurant therewith, and, when passing, or just after passing, appellant about the door, appellant used most vile, indecent and insulting language towards Brown. Brown resented it then, but friends interfered, and no encounter was then had. Brown, smarting under the insult, immediately went across the street to his sister's, got a double-

barrel shotgun, went across to the Stacy store, where he procured shells, and loaded the gun. The Stacy store was a block or less distant from the drug store. Brown's sister, brother-in-law and other friends, hearing of the difficulty and anticipating that he might kill appellant with the shotgun, induced him to give it up or took it away from him. His brother-in-law unbreeched the gun, took out the cartridges and placed the gun under the counter in the store. Brown did not thereafter have the gun in his hands at all or attempt to get it. He remained in the store. Appellant, with the knowledge that Brown was in the store and had taken the gun therein, went from the drug store to the Stacy store. In going, he drew his pocketknife before reaching the Stacy store and kept it open in his hand until he reached the store. This knife was shown to have had a blade a quarter of an inch wide and three and one-eighth inches long, the entire knife six inches long. It had a guard where the blade fitted into the handle, so that it was, or had the appearance of, a dirk or dagger.

The testimony of some witnesses was to the effect that, when appellant reached the Stacy store at this time, he renewed the insults to Brown. His friends again interfered, and two of them took him away to avoid a further difficulty or to prevent a killing. They carried him some distance from the Stacy store, tried in various ways to get him not to return to the store, but he persisted to such an extent that they turned him loose and desisted from any further efforts to keep him away from the Stacy store, where Brown remained. Upon his return to the store the second time, he again had his said knife open ready for use. The testimony of some witnesses clearly shows that appellant again renewed his insults to Brown, some of the witnesses making him the aggressor in then also assaulting Brown. They thereupon clinched. Appellant cut deceased's cheek open with his knife, cut him in the back of the left shoulder, stabbed him between the first and second ribs into the region of the heart, the doctor thinking it severed the aorta, from which wounds Brown expired in a very short time, without speaking.

Some of the witnesses made Brown the aggressor at the immediate time they clinched and began fighting. It was also a disputed question whether Brown had a knife in his hand and assaulted appellant therewith, some of the witnesses testifying he did have and assaulted appellant therewith, others to the effect that he did not have. Appellant claimed that deceased in this fight slightly cut him in places. The State's theory and claim was that these wounds were self-inflicted.

We have not attempted to give in detail the testimony, nor all of the disputed issues. We have merely given an outline so that the case may be understood in a general way.

The appellant has some bills to some claimed leading questions propounded by the State's attorneys to the witness W. C. Graham. The court qualified them by showing that the witness was decidedly adverse to the State, and for that reason he permitted said leading questions. These bills, as qualified, show no error. Carter v. State, 59 Texas

Crim. Rep., 73. A great many other cases in point could be cited, but it is unnecessary.

As explained and qualified by the court, no error was committed by the judge in refusing to permit defendant to ask the witness Frank Smith and have him answer the impression that was made upon his mind by the deceased at the time he saw deceased with said gun, which was at the time he was going with it from his sister's to the Stacy store, the court's qualification showing that appellant was not present, what occurred between Smith and deceased was not communicated to him, and that his impression of what he thought Brown's then intention was was inadmissible, the witness being permitted to testify all that was said and done between them at the time. Neither does another bill, wherein he sought to have the witness Jess Stacy testify that he, Stacy, believed that the deceased intended to go and shoot the defendant when he came into the store with the gun, as qualified by the court, show any error.

The court gave a most admirable and apt charge submitting every issue properly which was raised by the testimony and necessary to be submitted to the jury. The charge seems to have been prepared with a great deal of care and with a clear conception of the issues in the case. The court correctly and fully charged on murder. The evidence clearly and forcibly presented this issue. But, as the jury found the appellant guilty of manslaughter only, there is no necessity of giving or discussing the charge on that issue.

The court then correctly and fully charged the jury on self-defense in a most favorable and complete way in appellant's behalf and in every way which was raised by the evidence. Appellant's testimony with other testimony raised the issue of self-defense.

The court then charged on every phase of provoking the difficulty by appellant, and in each instance properly charged the converse of each issue on this subject raised by the testimony. Unquestionably, provoking the difficulty by appellant in every way submitted by the charge was raised by the testimony.

The charge submitted the question of manslaughter under our manslaughter statute on that phase of the testimony and the well established law by the many decisions of this court, as follows: "You are further instructed, that if you believe from the evidence, beyond a reasonable doubt, that the defendant by his own wilful and wrongful acts, if any, went to where the deceased, Eli Brown, was killed, for the unlawful and wilful purpose of provoking a difficulty with him, with the unlawful and wilful purpose and intention to commit an assault and battery upon Eli Brown, and you further believe from the evidence beyond a reasonable doubt, that the defendant did some act or used language or did both, with the unlawful and wilful intention of producing an occasion to bring on a difficulty and to commit an assault and battery upon deceased, Eli Brown, and that such acts or language or both of the defendant, if any, such there were, were reasonably calculated under the circumstances at the time, to provoke a difficulty

with the deceased and that such acts or language or both, if any such there was, of defendant caused the deceased to attack the defendant with a knife and that the defendant cut or stabbed Eli Brown with a knife and thereby killed him in order to save his own life, then if you so find, you are instructed that the defendant's plea of self-defense will not avail him, and the homicide would be manslaughter, and if you so find from the evidence beyond a reasonable doubt you will find the defendant guilty of manslaughter and assess the penalty as prescribed in this charge."

In the next paragraph the court submitted the converse of the proposition and told them, if that state of fact was true, appellant's right of self-defense was not forfeited, and he could stand his ground and defend himself by the use of such means as the facts and circumstances indicated to him to be necessary to protect himself from danger, or what reasonably appeared to him at the time to be danger. The charge of the court on this subject has many times been expressly approved by this court. Woodward v. State, 54 Texas Crim. Rep., 88; Prescott v. State, 54 Texas Crim. Rep., 485; Matthews v. State, 42 Texas Crim. Rep., 31; Tardy v. State, 47 Texas Crim. Rep., 444; Gray v. State, 61 Texas Crim. Rep., 454, and a large number of other cases collated by Mr. Branch in section 464 of his Criminal Law.

Appellant objected to the court's charge because it did not also submit a charge on manslaughter on the theory that deceased's attack of him with a knife produced that degree of passion sufficient to render him incapable of cool reflection. But he asked no special charge submitting manslaughter under any such a theory. By his charge No. 1, which quoted in substance articles 1128, 1129, and subdivisions 1 and 3 thereof, and 1130, told the jury that, if they believed from the evidence that just prior to and at the time of the killing of Brown he had been informed that Brown had gone after his gun for the purpose of killing him, and that at such time such acts and statements were of a nature to produce in his mind such passion, anger, rage, resentment or terror as to render his mind incapable of cool reflection and while his mind was in such condition they believed he was not acting in his self-defense he stabbed or cut Brown and thereby killed him, he would not be guilty of any higher offense than manslaughter, and, "if you so believe, or have a reasonable doubt thereof, it will be your duty to acquit defendant of the grade of murder." This special charge, as seen, is not a charge submitting the question of manslaughter on the theory appellant claims it should have been, but was a specific charge telling the jury, under the circumstances stated, they must not convict him of murder. In our opinion, as he was acquitted of murder and only convicted of manslaughter, the refusal of the court to give this charge does not present reversible error. And, further, as he was convicted of manslaughter only, the fact that the charge of the court submitted that question under one theory alone does not present reversible error. If the jury had found the appellant guilty of murder, then a different question would be presented. It might be that, if the

jury had convicted him of murder, it would have been reversible error
to have refused his said special charge No. 1. As he was acquitted
of murder and this charge was on that subject, murder passes out of
the case and so does said charge so far as presenting any error is
concerned.

As the court submitted appellant's claimed self-defense in a full and
complete charge properly as presented by the testimony, the court did
not err in refusing appellant's said charges Nos. 3, 4 and 5 on that
subject. Neither did the court err in refusing his special charge No. 9
about his right to arm himself with a pistol, etc., as the evidence did
not properly raise the necessity of any such charge.

After a careful consideration of the record in this case, the forcible
brief filed by appellant's able attorneys and the oral argument of this
case, we think no reversible error is shown, and that the judgment
should be affirmed, which is accordingly ordered.

*Affirmed.*

DAVIDSON, JUDGE, absent.

ON REHEARING.

February 16, 1916

PRENDERGAST, PRESIDING JUDGE.—Appellant urges some of the
same propositions which he urged when the cause was submitted and
decided. We will discuss the one we think is necessary.

His first contention is that this court erred in holding that the lower
court was justified in charging on provoking the difficulty, asserting:
"We earnestly submit to the court that there is not one line of testi-
mony in this record from the caption of the statement of facts to the
certificate of the court approving same that authorized the court to
charge the jury on the law of provoking the difficulty." Surely, ap-
pellant's attorneys have forgotten the record, or they could make no
such assertion.

The statement of facts contains some eighty-five typewritten pages
and shows that some twenty-seven witnesses testified. In the original
opinion we gave a correct general statement amply established by the
evidence but did not quote the testimony of the respective witnesses.
Of course, we can not now undertake to quote all of the witnesses nor
all of the testimony. We will give some of it on this issue of pro-
voking the difficulty. In addition to what we give, there is testimony
by other of the witnesses substantially to the same effect. The record
teems with testimony raising the issue, and in fact showing that appel-
lant provoked the difficulty. And the jury were clearly authorized
therefrom to believe, as they did, that appellant provoked the difficulty
for no other purpose than that of either killing deceased or doing him
serious bodily injury.

There was but one difficulty between the parties. Several minutes
elapsed between the beginning of it to the time that appellant killed

the deceased. There is no particle of testimony in this record which shows, or tends to show, that appellant had the slightest cause from deceased to grossly insult him as he did and continue his gross insults and abuse of him from the time he first began it until after he had stabbed him to the heart and killed him.

All of the witnesses—and there were several of them, including appellant himself—who saw and heard the beginning of the difficulty at Bowen's drug store, clearly and without doubt, establish this state of fact there: The deceased, Eli Brown, walked into said drug store from his sister's restaurant across the street to get a bucket of water at a hydrant at the back end of the drug store. In going, he passed appellant and some of his friends. He neither said nor did anything whatever to appellant. Appellant hailed him: "Hello, Brown." Brown responded: "Hello!" After getting his bucket of water, he passed back the same way that he had entered, and, when he got to the door appellant said to him, so he himself swore: "Don't you want to shoot some craps, Eli?" Eli Brown, deceased, responded: "No, I don't do that." Appellant then said: "Suck your a— then." Deceased responded: "Don't you get too smart." Appellant then said to him: "That's what I said, you son-of-a-bitch." What we have just given is from the sworn testimony of appellant himself in his direct examination. Mr. W. C. Graham, who was present in the drug store at this time, swore that appellant then, in addition, said: "Go to hell, and go on there with your slop," as Brown started off with his bucket of water. Graham further swore that appellant further said to Brown something like "kiss my a—." Hubb Jones, one of appellant's witnesses, who was present and saw and heard what occurred in the drug store, swore that appellant also said to Brown there: "Brown, if you don't like that, suck my a—, you son-of-a-bitch." Other witnesses who were present testified substantially to the same thing. It is unnecessary to quote them. All of them also show that then Brown, at this time, set his bucket of water down and started to resent appellant's most insulting, indecent and provoking language to him. Tom Menge, who was then present, swore: "Brown was turning facing him (appellant) with a bucket of water, and Geary (appellant) drew his knife and says: 'G—d d—n you, don't come on me. G—d d—n you, I'll kill you.' At the time the defendant drew his knife Brown was standing in the door or inside the door somewhere about the door. Brown was turned facing him, when he (appellant) called him (Brown) a son of a b—h." Appellant himself, on cross-examination, swore that he himself then got out his knife. He said: "I went down there after mine. And I got it out and opened it, and I said: 'That was just what I said, you son-of-a-b—h.'" All the other witnesses, and appellant himself, further swore that his friends then got in between them, and they all in effect swore that no one at the time held Brown but that two or three of them at the time held appellant and kept him from then assaulting and killing Brown with his knife. The evidence, as stated in the original opinion, without any dispute, showed the char-

acter of his knife then drawn by appellant, and with which he soon afterwards killed Brown. It was a most deadly weapon—in effect it was a dirk or dagger, with a guard between the handle and the blade, the blade being three and one-eighth inches long.

All the testimony, without dispute, shows that deceased went directly from the drug store to his sister's, Mrs. Jarrett's, a short distance only, at once procured a double-barrel shotgun, went immediately therewith to the Stacy store, procured shells and loaded the gun. His sister, Mrs. Jarrett, and her husband and other friends, having heard of the difficulty at the drug store, immediately went to deceased in the Stacy store and induced him to surrender the gun, which he did, and the shells were then taken out by Mr. Jarrett, his brother-in-law, and the gun placed under the counter. Deceased at no time thereafter had the gun in his hands or attempted to procure it but remained in the Stacy store. His sister and others were attempting to get him to go back to her residence, or hotel. Before he could do so, appellant went from the drug store to Stacy's store.

Aaron Bowen, who was present at the drug store and saw and heard what then occurred, swore that, after Brown left the drug store, appellant remained there just a little bit. He further swore: "I saw him when he left the drug store. He stated to me where he was going. He said Brown was over there with a gun, and he was going over there. He went out at the front door." This witness further swore that he heard appellant down there at the store cursing and that he then went down there. Mrs. Burrows, the postmistress, swore that in order to reach Stacy's from the drug store, appellant had to pass the postoffice, the postoffice and Stacy's joining. That, when appellant thus approached Stacy's store: "He was just saying: 'The G—d d—n son-of-a-b—h,'" to Brown. That Mr. Bowen tried to get him to go away. "I told him he would have to get away from the front of the office to swear; that I would make it cost him something if he didn't." The witness Arch Johnson swore that, at this time, "the defendant came up with a knife in his hand and was walking towards the crowd where Brown was," and he, the witness, caught with both his hands appellant's arm in which he had the knife, "and held him until Aaron Bowen walked up, and then we both turned and led him in behind some stores there"; and that appellant, when they first started away with him said: "You think I want to go, don't you? I am not afraid of him or all the shotguns he can get." On cross-examination Johnson further testified that at this time Brown was right near the door of Stacy's store, "and the defendant was right on the gallery with his open knife, and I took hold of him. He had his knife in his right hand." That Brown said nothing to him at the time; that he and Aaron Bowen both took hold of him at that time. "I pulled him. He pulled back once." Mr. Graham further swore that when appellant came to the store the first time he came from out of the crowd somewhere, "and he came rushing up to the store and says: 'Let me get to him.'" Mr. B. K. Bowen swore that when these parties took hold of him to take

him away when he first went to the Stacy store, "he seemed to be pulling back." "I heard him say that with an oath, the G—d d—n peaked face son-of-a-b—h said he was going to shoot me, and he must shoot me." That he kept repeating this. That the parties who had hold of him were insisting that he come on and not have any trouble, and he would reply: "He said he was going to shoot me, and he must shoot me." The testimony of these two witnesses and several others also is to the effect that Johnson and Aaron Bowen then took him away from the Stacy store and did all they could to persuade him not to return to the Stacy store, where Brown was. Appellant himself swore that they took him thirty-four steps from Stacy's store and tried to keep him from going back there. Aaron Bowen swore: "He said he wanted to go back over there; that Brown wanted to run him out of town, and then I told him to go ahead.. He said he wanted to go back over there; that Brown was over there with a gun; that Brown wanted to run him out of town, and I told him to go ahead." That appellant then went back to the Stacy store, and he, the witness, went back to the drug store.

Mell Pearce testified: "Just before the fight occurred I heard the defendant make a statement that he was laying for Brown; that he was after Brown." Again, he heard him say he was laying for Brown, or was after Brown. "Brown's the man I am after."

All the witnesses, and appellant himself, said that it was upon his return to the Stacy store that the fight occurred in which appellant stabbed and killed the deceased. Mr. Graham swore that when appellant came back the second time to Stacy's store, "and defendant came and cornered Brown and called him a G—d d—n son-of-a-b—h, and that was what I said a while ago, and he came back cussin'. He just came up through the crowd there and called him a son-of-a-b—h. He called Mr. Brown a son-of-a-b—h. I think that was the second time he came back and called him a son-of-a-b—h. He came up there twice cursing." Mrs. Burrows testified that, when appellant returned to the Stacy store the second time, "Mr. Atkison (appellant) ran into the store; and, as he went in he said just the same thing, the same oath, that he had been saying. He just ran past Mrs. Jarrett and grabbed Mr. Brown by the collar." What he had been saying, as shown by a previous quotation of her testimony, was calling Brown a G—d d—n son-of-a-b—h. Mr. W. B. Arthur swore that, when appellant returned this second time, deceased said to him: "'You have abused me without any cause'; and he says: 'I think you ought to take it back'; and Atkison refused to take it back. He says: 'I won't take anything back, you peaked faced son-of-a-b—h'; and, when he said that Brown jumped and struck at him; and, when he did that, I pushed Brown back with that arm and shoved Atkison back with that one, and they came around me, and Brown came round the other way, and they went to knocking." Mr. B. K. Bowen swore: "The deceased said: 'You called me a son-of-a-b—h, didn't you?' Geary said: 'No.' Brown said, 'You called me a son-of-a-bitch,' the second time. And that he

(appellant) said: 'Yes, you are a G—d d—n peaked face son-of-a-b—h.' And then they clinched there." Jess Stacy swore that when deceased took hold of appellant, he said: " 'You called me a son-of-a-b—h,' and he (appellant) said: 'Yes, I did, you G—d d—n son-of-a-b—h or bastard.' I heard him say that. He didn't say a word about willing to take it back or anything or willing to apologize, but did say he was a son-of-a-b—h bastard." Appellant himself on cross-examination swore: "The first I knew Brown had me in the collar, and he said: 'You called me a son-of-a-b—h,' and grabbed me in the collar, and I stated: 'Yes, that he was a G—d d—n son-of-a-b—h.' " O. B. Jarrett swore that when appellant started in the house just before the fight: "I heard him say: 'The d—n son-of-a-b—h.' "

All the testimony then shows that deceased and appellant went to fighting. They clinched. Appellant was cutting and stabbing deceased with that most dangerous knife, or dagger, and plunged it into deceased's heart, or the aorta thereof; and that when deceased then got away from him, he ran and the appellant ran after him. Deceased fell in the dark, and almost immediately thereafter expired. In running after him, the appellant stumbled; and, as deceased was in the dark and he could not see him, he immediately returned to the Stacy store, got up on the gallery, and even then Mrs. Jarrett swore he said: "Go, you son-of-a-b—h." Tom Menge swore that when appellant got back up on the gallery of the Stacy store immediately after he had stabbed and run deceased: "I heard the defendant say that he was going to kill every G—d d—n Jarrett in that town that night." Mr. B. K. Bowen swore that appellant then said: "The Jarretts are G—d d—n m—r f—g s—s of b—hes, every one of them." Mrs. Fannie Johnson, who was 350 or 400 yards away, said she heard him then talking and cursing loud, and: "I heard him call the Jarretts' name and say they were G—d d—n s—s of b—hes, and everybody that was kin to them, and everybody that was friends of them."

There can be no shadow of doubt but that provoking the difficulty by appellant was in the case from start to finish, and it was the duty of the court to charge on provoking the difficulty. The State has just as much right to·have every issue raised by the evidence in its favor charged upon as the accused has. As stated in the original opinion, the court correctly charged on this question and also in appellant's favor charged the converse.

We have carefully reconsidered the other grounds of appellant's motion for a rehearing. There is no necessity of restating or discussing them, as they were all properly decided in the original opinion. Nothing new is urged as to these grounds in the motion for a rehearing. The motion is overruled.

*Overruled.*